STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
| --- | --- | --- |
| In re Brosseau/Wedgewood | } | Docket No. 260-11-08 Vtec |
| Act 250 PRD Application | } |  |
|  | } |  |

Decision and Order

Appellant-Applicants Lauretta Brosseau and Wedgewood Development Corporation appealed from a decision of the District 4 Environmental Commission (District Commission) denying their application[1] for an Act 250 permit for a proposed planned residential development in the Town of Colchester. Appellant-Applicants (Applicants) are represented by Robert C. Roesler, Esq.; the Agency of Agriculture, Food and Markets (the Agency) is represented by Diane E. Zamos, Esq.; and the Town of Colchester is represented by Thomas G. Walsh, Esq. The Land Use Panel of the Natural Resources Board entered an appearance, represented by John H. Hasen, Esq., but did not participate in the trial or file any requests for findings or memoranda of law. The Agency of Natural Resources requested informational status only.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken prior to the hearing date, with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings. After the Vermont Supreme Court's decision in In re: Village Associates Act 250 Land Use Permit, 2010 VT 42A, affecting the legal standard applicable to this case, an additional evidentiary hearing was held to allow the

---

[1] Daniel and Christie Fitzgerald, who own the remaining 1.75 acres that is not involved in the proposed PRD, were also named on the application but did not enter an appearance in this appeal.

1

parties to present supplemental evidence directed to the newly articulated standard. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Applicants applied for an Act 250 permit for a proposed 29-lot Planned Residential Development (PRD) on a 36.15-acre parcel of property on the northerly side of Jasper Mine Road in the Town of Colchester, about one mile from Exit 17 of Interstate 89 (I-89). The area of Colchester surrounding the Exit 17 interchange, and extending along Jasper Mine Road past the project site, is in the Exit 17 neighborhood of the Town of Colchester, described in the Town Plan as containing the Exit 17 future growth center, a "long-term economic future growth center" to be developed after the Severance Corners designated growth center is completed. Ex. T-2 at 11. The Exit 17 future growth center is described as being bounded on the north by Jasper Mine Road, so that the project property would not be within the designated growth center boundaries; however, the parties have not provided the "Exit 17 Growth Center Plan" adopted in 2000 describing this area in detail. Ex. T-2 at 11. The Colchester Town Plan states as Policy 6 for the Exit 17 neighborhood as a whole that the "area is designated as suburban residential, village mixed use, and growth center on the Future Land Use Map." Ex. T-2 at 12. That map shows that the project property will be located in a suburban residential area, across Jasper Mine Road from the village mixed use area, and near the Exit 17 growth center. Ex. T-5.

U.S. Route 2, constructed around 1970, runs in a southeast to northwest direction in the Exit 17 area, from Exit 17 of I-89 towards and across the Lamoille River. Route 2 is used for through traffic traveling from the Exit 17 interchange towards the Champlain Islands and is a very heavily traveled roadway. Jasper Mine Road runs parallel to and slightly to the northeast of Route 2, and extends from I-89 to the Lamoille

2

River. Since the construction of Route 2 and at the present time Jasper Mine Road is used almost exclusively for local traffic. The project site is not visible from Route 2 and tourist traffic does not generally use Jasper Mine Road; a farm stand located at the project property on Jasper Mine Road would not attract many customers.

Applicant Brosseau and her late husband purchased the project parcel in 1963; it has not been used for agriculture at least since 1942. No farmers or other agricultural operations have ever approached the Brosseaus seeking use of the property for haying, pasture, tree farming or other agricultural use. The property is served by a good drilled well water supply. Near the road, the property is developed with nine small separate cabins, separated from the road by a curved driveway. The area between the driveway and the road represents approximately an acre of open land, except for a few large pine trees. Approximately 33 acres of the project property is wooded with second-growth, mature trees, suitable for harvesting for wood chip production rather than for lumber. The one-acre open area between Jasper Mine Road and the cabins' driveway is relatively flat; the Brosseau family flooded it for use as a skating rink in the winter. The Brosseaus operated the cabins as commercial rentals, and also operated a restaurant on the property. At the present time two of the cabins are winterized and used as rental properties; the property taxes on the proposed project site are approximately $8,000 to $9,000 per year.

The property drops off in elevation away from the road and cabins by about eight to fifteen feet, and is relatively flat throughout the project parcel except for a knob or knoll of land rising steeply near the northwesterly side of the project property in the area proposed for lots 14, 15, and 16. The property drops off steeply at the northeast corner. Four or five areas of Class 3 wetland, and an area of Class 2 wetland with its associated fifty-foot buffer area, extend across the central area of the property generally from the southeast corner to the northerly side of the property.

The developed properties immediately surrounding the project parcel, including

3

those on the opposite sides of Jasper Mine Road and Watkins Road, are all in residential use, except for a small cemetery separating the southwesterly corner of the project property from Jasper Mine Road. Properties in commercial and industrial use are located to the east of the project's general area, closer to the Exit 17 interchange. Residential developments similar to that proposed for the project property are located generally to the west and north of the property. No commercial or economic agricultural operations adjoin the project property or are located nearby. In fact, very few agricultural operations are located within a three-mile radius of the project property, and of these, most could be accessed from the project property only by traveling along heavily traveled roadways.

Dairy farmers in this area of Vermont routinely rent fields not contiguous with their home farms, to grow hay or silage corn for use on their farms; they also arrange to cut hay on others' fields in return for removing the hay crop. In general, they are willing to travel as much as three or four miles to reach such fields, as long as the roadway to be used for such travel is not a heavily traveled road unsuitable for slow agricultural machinery. On the other hand, it is not practical for farmers to grow crops such as sweet corn or berries on fields that are that far from their home farm, because of the need for more frequent cultivation and the difficulties in preventing vandalism or theft of crops from such fields.

Of the 36.15 acres of the project parcel, 34.4 acres are involved in the proposed PRD. The proposed PRD consists of 26 single-family house lots, each approximately a half–acre in area, as well as three common area lots totaling nearly twenty acres. The house lots are located on a loop roadway surrounding Common Area B, which contains the Class 2 wetland and its buffer, as well as Class 3 wetlands; Common Area A is located between the easterly boundary of the property and the loop road, and also contains a Class 3 wetland area.

4

The only issue in the appeal is whether the project complies with Criterion 9(B) of Act 250, 10 V.S.A. § 6086(a)(9)(B); the basis on which the application was denied by the District Commission. The analysis of primary agricultural soils under Act 250 requires several steps. First, the decisionmaker must determine whether the soils on a project parcel meet the statutory definition of primary agricultural soils in 10 V.S.A. § 6001(15). If and only if primary agricultural soils are located on a proposed project site does the analysis turn to Criterion 9(B) of Act 250, 10 V.S.A. § 6086(a)(9)(B). Criterion 9(B) requires the applicant to demonstrate <u>either</u> that the proposed project will not reduce the agricultural potential of such soils, <u>or</u> that the proposed project will comply with all four subcriteria, including any appropriate mitigation called for by subcriterion (iv). 10 V.S.A. §§ 6086(a)(9)(B), 6093.

<u>Soils Affected by the Proposed Project</u>

Of the 27.4 acres of soils on the project parcel with a rating of prime, statewide, or local as defined by the Natural Resources Conservation Service of the United States Department of Agriculture (USDA-NRCS), the parties agree that at least 15.3 acres of such soils will be affected by the proposed project. The Agency argues that an additional 2.8 acres of such soils, for a total of 18.1 acres of such soils, are also affected by the proposed project. The 2.8 acres consists of 1.8 acres between the knoll and the westerly property line, plus the one acre at the front of the property between the cabins' driveway and Jasper Mine Road.

The one acre at the front of the property is separated from the remainder of the property by the cabins' driveway and the arc of cabins themselves. Although that acre is flat and accessible to agricultural equipment, the existence of the rental cabins prevents the acre at the front of the property from being used for commercial or economic agriculture.

5

The additional 1.8-acre area is a long, narrow area, only about forty feet wide at its narrowest point, located generally between the project property's westerly boundary and the knoll in the northwest area of the property. It adjoins the back yards of five residential properties and adjoins the cemetery. Although access to the 1.8-acre area is available over a relatively flat path or woods road between the cemetery and the knoll, the 1.8-acre area is too narrow, too close to the residential back yards, and too isolated from the remaining soils to be used for any reasonable agricultural purpose and therefore to be classified as primary agricultural soils.

Accordingly, 15.3 acres of the 27.4 acres of soils classified as prime, statewide, or local under the USDA-NRCS system are affected by the proposed project.

Primary Agricultural Soils as defined by 10 V.S.A. § 6001(15)

Since the statutory amendments to Act 250 in 2006, associated with the then-new growth center legislation, 2005, No. 183 (Adj. Sess.), primary agricultural soils are defined for the purposes of Act 250 review in 10 V.S.A. § 6001(15) as:

> soil map units with the best combination of physical and chemical characteristics that have a potential for growing food, feed, and forage crops, have sufficient moisture and drainage, plant nutrients or responsiveness to fertilizers, few limitations for cultivation or limitations which may easily be overcome, and an average slope that does not exceed 15 percent. Present uses may be cropland, pasture, regenerating forests, forestland, or other agricultural or silvicultural uses. However, the soils must be of a size and location, relative to adjoining land uses, so that those soils will be capable, following removal of any identified limitations, of supporting or contributing to an economic or commercial agricultural operation. Unless contradicted by the qualifications stated in this subdivision, primary agricultural soils shall include important farmland soils map units with a rating of prime, statewide, or local importance as defined by the Natural Resources Conservation Service (N.R.C.S.) of the

United States Department of Agriculture (U.S.D.A.). [2]

This definition represents a change in focus from the prior language of this section,[3] and a greater statutory recognition of the system for categorizing soils used by

[2] The text below shows the changes made by 2005, No. 183 (Adj. Sess.) to 10 V.S.A. 6001(15). The new material is underlined and the deleted material is struck through**:**
"Primary agricultural soils" means ~~soils which have a potential for growing food and forage crops, are sufficiently well drained to allow sowing and harvesting with mechanized equipment, are well supplied with plant nutrients or highly responsive to the use of fertilizer, and have~~ soil map units with the best combination of physical and chemical characteristics that have a potential for growing food, feed, and forage crops, have sufficient moisture and drainage, plant nutrients or responsiveness to fertilizers, few limitations for cultivation or limitations which may easily be overcome, ~~In order to qualify as primary agricultural soils, the~~ and an average slope ~~of the land containing such soils~~ that does not exceed 15 percent. ~~, and such land is~~ Present uses may be cropland, pasture, regenerating forests, forestland, or other agricultural or silvicultural uses. However, the soils must be of a size and location, relative to adjoining land uses, so that those soils will be capable, following removal of any identified limitations, of supporting or contributing to an economic or commercial agricultural operation. ~~If a tract of land includes other than primary agricultural soils, only the primary agricultural soils shall be impacted by criteria relating specifically to such soils.~~ Unless contradicted by the qualifications stated in this subdivision, primary agricultural soils shall include important farmland soils map units with a rating of prime, statewide, or local importance as defined by the Natural Resources Conservation Service (N.R.C.S.) of the United States Department of Agriculture (U.S.D.A.).

[3] Relatively few cases have addressed primary agricultural soils at all since the current version of 10 V.S.A. § 6001(15) took effect on July 1, 2006, and only two have considered the new language. See Village Associates, 2010 VT 42A; In re: Eastview at Middlebury, Inc., No. 256-11-06, slip op. at 22 (Vt. Envtl. Ct. Feb 15, 2008) (Durkin, J.) (determining that project lands are capable of contributing to an economic or commercial agricultural operation, particularly if used in conjunction with other nearby agricultural lands).
Other cases decided after July 1, 2006 applied the previous version of 10 V.S.A. § 6001(15). In re: Times and Seasons, LLC, 2008, VT 7, ¶ 16, 183 Vt. 336; In re: Times and Seasons, LLC, No. 45-3-09 (Vt. Envtl. Ct. Mar. 29, 2010) (Durkin, J.); In re: JLD Properties of St. Albans, LLC, Nos. 129-5-06, 242-10-06, 92-5-07, 221-10-07, 80-4-08, 116-6-08 Vtec, (Vt. Envtl. Ct. Jan. 20, 2010) (Durkin, J.). The remaining cases involving Criterion 9(B) only involved litigants' party status, or involved primary agricultural soils as an

the USDA-NRCS. It was only in this most recent statutory change that the definition uses the term "soil map units," and incorporates by reference the farmland classification system used by the USDA-NRCS (discussed further at footnote 5, below).

For the purposes of facilitating an accurate analysis in any Act 250 Criterion 9(B) case, such as the present appeal, the statutory definition of primary agricultural soils in § 6001(15) may be considered as consisting of two equally important concepts or components, both of which must be met for the soils on the project site to be considered as primary agricultural soils triggering further analysis under Criterion 9(B). The first component considers whether the soils have sufficiently favorable physical, chemical, drainage and topographic characteristics; that is, whether they have a high enough rating in the USDA-NRCS soils rating system. The second component explicitly considers the economics of farming;[4] it requires the decisionmaker to determine whether the soils are capable of sustaining an economic or commercial agricultural operation on the project parcel, or contributing to such an operation conducted off site.

---

undisputed fact. In re: Morgan Meadows/Black Dog Realty Subdivision Act 250 Permit, No. 267-12-07 Vtec (Vt. Envtl. Ct. May 1, 2008 (motion decision)) and (Vt. Envtl. Ct. Dec. 1, 2008 (reconsideration)) (Wright, J.) (party status); In re: Rinker's Inc., No. 302-12-08 (Vt. Envtl. Ct. Sept. 17, 2009) (Wright, J.) (party status); In re: Pion Sand & Gravel Pit, No. 245-12-09 Vtec (Vt. Envtl. Ct. July 2, 2010) (Durkin, J.) (party status); In re: Gizmo Realty/VKR Associates, LLC, No. 199-9-07 Vtec (Vt. Envtl. Ct. Apr. 30, 2008 (summary judgment)) and (Vt. Envtl. Ct. Mar. 10, 2009 (decision)) (Durkin, J.) (undisputed fact).

[4] As discussed in Village Associates, 2010 VT 42A, ¶ 19, the economics of farming must be considered in order to avoid unnecessarily protecting "fictitious farms." Agricultural economics are explicitly considered in the second component of § 6001(15); in the "appropriate circumstances" for mitigation flexibility found in § 6093(a)(3); and in § C(2)(a)(i) of the "Statement of Procedure: Preservation of Primary Agricultural Soils," adopted under the Administrative Procedure Act by the Land Use Panel of the Vermont Natural Resources Board (NRB Primary Agricultural Soils Procedure).

The language used in the definition covering the first component—the physical, chemical, drainage and topographic characteristics of the soils—actually tracks the language already used in the soils rating system of the USDA-NRCS, including the concept of whether the soils have limitations for cultivation and how hard it is to overcome those limitations. This portion of the definition may be thought of as the innate or natural potential of the soils for growing crops. This concept covers the following language from the § 6001(15) definition:

> [S]oil map units with the best combination of physical and chemical characteristics that have a potential for growing food, feed, and forage crops, have sufficient moisture and drainage, plant nutrients or responsiveness to fertilizers, few limitations for cultivation or limitations which may easily be overcome, and an average slope that does not exceed 15 percent. . . . Unless contradicted by the qualifications stated in [the remainder of the definition, discussed below] primary agricultural soils shall include important farmland soils map units with a rating of prime, statewide, or local importance as defined by the Natural Resources Conservation Service (N.R.C.S.) of the United States Department of Agriculture (U.S.D.A.).

Thus, soils categorized as prime, or as having statewide or local importance in the USDA-NRCS rating system, are presumed to qualify as primary agricultural soils unless, under the second component of § 6001(15), they are shown to be incapable of supporting or contributing to an economic or commercial agricultural operation. In addition, soils which in fact have the requisite physical, chemical, drainage and topographic characteristics, but have not been so characterized in the USDA-NRCS rating system, are considered to qualify as primary agricultural soils, again, unless they are incapable of supporting or contributing to an economic or commercial agricultural operation.

The second component in the definition of primary agricultural soils addresses the economic potential of the land to actually be used for agriculture. This concept covers the following language from the § 6001(15) definition:

9

Present uses may be cropland, pasture, regenerating forests, forestland, or other agricultural or silvicultural uses. However, the soils must be of a size and location, relative to adjoining land uses, so that those soils will be capable, following removal of any identified limitations, of supporting or contributing to an economic or commercial agricultural operation.

Soil Map Units on the Project Parcel

The parties do not dispute that 27.4 acres of soils on the project parcel have a rating of prime, statewide, or local as defined by the USDA-NRCS. These soils are therefore considered to be primary agricultural soils, unless "contradicted by the qualifications stated" elsewhere in § 6001(15) (and discussed at length in the following section of this decision). Of these soils, 15.3 acres will be affected by the project, that is, under Criterion 9(B), the development will result in the "reduction in the agricultural potential" of 15.3 acres of these soils.

Under Village Associates, the cost of removing the forest cover is to be considered in the analysis under the first component of § 6001(15), rather than under the second component.[5] 2010 VT 42A, ¶ 23. If the forested cover of the property were

---

[5] The Supreme Court, in deciding Village Associates, may not have had available to it the USDA-NRCS soils rating system applicable to Vermont, found in the present case in State's Ex. D, USDA-NRCS, Farmland Classification Systems for Vermont Soils (2006). This system classifies soils based upon the presence or absence of specifically listed limitations for cultivation. For statewide soils, the listed limitations are: excessive slope and erosion hazard, excessive wetness or slow permeability, flooding hazard, shallow depth to bedrock (limiting the root zone and available water capacity), and moderately low to very low available water supply. State's Ex. D at 3. (These are the types of limitations discussed in the Environmental Board decisions cited in Village Associates 2010 VT 42A, ¶ 13.) The 'limitations' considered in the farmland classification system do not include the crop of trees or other plants growing on the soils at the time of evaluation. Class 1 soils are then defined as having "few limitations that restrict their use," while other classes have moderate or severe limitations that reduce the choice of plants or require conservation practices or careful management to allow them to be used. State's Ex. D at 12. The classification system for Agricultural Value Groups then

10

to be removed for conversion of the agricultural soils to agricultural use,[6] the trees would be sold for wood chip use (or possibly as cordwood), and the stumps would be placed at the edges of the useable field areas so that any topsoil entrained by the roots could be washed off by rain and remain on the property. Because this work could be done over time and by the farmer, it would cost approximately $1,000 per acre. Removal of the forested cover of the property for development purposes, with the work done by appropriate contractors under an erosion control permit, and with the trees and stumps being removed from the property, would cost approximately $2,625 per acre.

If cleared for agriculture, the suitable soils on the project property could grow sweet corn, berries, or hay, producing a crop within two to three years after clearing. Farmers amortize the cost of adding new acreage to production over a period of approximately five years. The net income per acre for sweet corn, exclusive of harvest labor costs, is approximately from $2,000 to $3,250 per acre, depending on whether the corn is sold at wholesale or at retail. The net income per acre for strawberries, exclusive of harvest labor costs, and assuming that they could all be brought to market, is as much as approximately $18,000 per acre. The net income per acre for hay in dry square bales is approximately $1,125 per acre. The net income for corn silage is approximately $400 per acre. The net income for hay silage is approximately $385 per acre.

Accordingly, if the forest cover of the project property is considered to be a

_____

examines whether corrective measures, such as drainage, can be installed to allow the use of those soils for crop production. The classification system clearly states that, "[n]ormally, the cost" of installing corrective measures to overcome such limitations "should not be considered when making this determination." State's Ex. D at 10.

[6] Evidence was presented briefly suggesting that ginseng could be grown in wooded conditions; however, insufficient evidence was presented on its cultivation requirements for the Court to make any findings as to this potential agricultural use of the project property.

11

limitation under the first component of § 6001(15), as interpreted in <u>Village Associates</u>, the cost of overcoming that limitation is not "so high that conversion of the land into agricultural use is not economically feasible." 2010 VT 42A, ¶ 23. Rather, the cost of tree removal, even if calculated at $2,625 per acre rather than at $1,000 per acre, could be amortized in an agricultural operation within two to five years, depending on the crop planted and the market conditions. However, the cost of tree removal would make it uneconomical to cut the trees solely in order to grow hay or corn silage on the property, or to convert the property to pasture.

<u>Capability of Supporting or Contributing to an Economic or Commercial Agricultural Operation</u>

The 27.4 acres of soils on the project parcel classified as prime, statewide, or local under the USDA-NRCS system, following removal of the trees, are of a <u>size</u> capable of contributing to an economic or commercial agricultural operation, raising berries or sweet corn, or even hay or silage corn, but they are not of a <u>location</u>, relative to adjoining (or even nearby) land uses, capable of supporting or contributing to an economic or commercial agricultural operation. As to size, even given the location of the useable soils in two segments surrounding the wetlands and constrained by the knoll, the appropriate soils on the property could be planted with sweet corn or prepared for strawberries, or could be prepared for a hay crop.

Of the agricultural operations within a three-mile radius of the project property, the closest one to the project property is located south of the project property on the other side of Route 2: the Hillis Sugarbush Farm and Vineyard. Access to this property from the project property would necessitate crossing Route 2 but not traveling along Route 2. This operation grows grapes and keeps a horse, and possibly also keeps sheep. No evidence was presented as to whether this operation holds itself out as a business or is an economic or commercial agricultural operation; rather, evidence was presented

12

that this instead is a farm run as a sideline or hobby. No evidence was presented as to whether the owner of this agricultural operation would actually be willing to cultivate or cut hay or use any other agricultural product from the project property.

Only two of the agricultural operations within a three-mile radius, both dairy farms, appear to be able to be accessed from the project property without traveling on Route 2. The nearest is located to the north of the project property in the Town of Milton, approximately 2.6 miles away by local roads; the other appears from the map to be approximately two miles farther by road from the project property. No evidence was presented from the farmers of either of these particular farms as to whether they actually would be willing to cultivate or cut hay or use any other agricultural product from the project property. Rather, an experienced dairy farmer would be willing to cut hay from the project property only if no rent or other costs were charged and if no more than a few miles of travel on local roads was necessary.

Two other dairy farms are located within a three-mile radius, but are located west of the Lamoille River and appear from the map to require travel for several miles along Route 2, as well as being much farther from the property by road. One of these farms, on Cadreact Road and Bear Trap Road, also keeps horses. No evidence was presented suggesting that the farmers of these farms would actually be willing to travel to cultivate or cut hay or use any other agricultural product from the project property. The Bear Trap Nursery is also located to the northwest of the project property west of the Lamoille River; access to it from the project property appears from the map to require travel for several miles along Route 2. The Bear Trap Nursery holds itself out as a business, selling at least pumpkins, gourds, and chrysanthemums. No evidence was presented as to whether this agricultural operation would actually be willing to travel to cultivate or cut hay or use any other agricultural product from the project property.

Three remaining agricultural operations within a three-mile radius of the project property are located to the east of I-89, which runs in a north-south direction at this

13

location. One is an approximately 23-acre field of corn located on U.S. Route 7, a heavily-traveled roadway running in a north-south direction parallel to and to the east of I-89. Access to this field of corn from the project property appears from the map to require travel both on Route 2 and Route 7. No evidence was presented as to who cultivates this field or whether this agricultural operation would actually be willing to cultivate, harvest, or use any agricultural product from the project property. Similarly, a Christmas tree farm is located approximately two miles farther east, and would require travel on Routes 2 and 7 and local roadways. No evidence suggested that the tree farm would actually be willing to cultivate, harvest, or use any agricultural product from the project property. Finally, the Elm Hill Farm is located on Route 7 approximately two miles south of Exit 17, and would require traveling approximately three to four miles along Routes 2 and 7. It holds itself out as a business, selling at least pumpkins, apples, mulch hay and Christmas trees, although it is not clear which or how much of these agricultural products are raised on the property. That is, no evidence was presented as to the extent to which the Elm Tree Farm is actually an economic or commercial agricultural operation, or whether it sells agricultural products raised elsewhere. It does also sell fencing, furniture and sheds made from wood grown off the property. No evidence was presented as to whether this agricultural operation would actually be willing to travel to cultivate or cut hay or use any other agricultural product from the project property.

The property therefore is not located close enough or with convenient enough local road access to any commercial or economic agricultural operation to contribute to that operation, and is not located close enough to a farm stand or other market opportunity to sustain its own economic or commercial agricultural operation without a farmer living on or near the property. It is surrounded by residential, commercial, and industrial uses, and is located in an area planned for residential development, adjacent to a village mixed use area and near a planned growth center. It is on a local roadway

14

not suitable for a roadside agricultural stand, as most of the traffic in the area that might stop at such a stand travels instead on Route 2. No economic or commercial agricultural operation in the area would cultivate the project property or cut hay on it, or raise berries or other economic crops on it. At most, a farmer might be willing to come to cut a hay crop on the project property at no cost; this might be an agricultural use of the project property but would not be an economic one, much less a commercial one.

Although properties of this size and soil quality in general may well be capable of supporting an on-site or contributing to an off-site economic or commercial agricultural operation, this particular property is not. Despite the physical, chemical, drainage and topographical qualities of the soils, the location of this particular property means that it will not be used for agriculture regardless of the proposed development, Village Associates, 2010 VT 42A, ¶ 19; its soils do not qualify as primary agricultural soils under the second component of the § 6001(15) definition.


Criterion 9(B) Mitigation Analysis

Applicants also argue, in the alternative, that this project presents "appropriate circumstances" for payment of a mitigation fee to preserve agricultural soils off-site, if the project property were considered to contain primary agricultural soils. As the Court has ruled that the project property does not contain primary agricultural soils, it is enough to note that the considerations for mitigation flexibility under 10 V.S.A. § 6086(a)(9)(B)(iv), § 6093(a)(3), and in the NRB Primary Agricultural Soils Procedure § C(2)(a)(i) are similar to those discussed in this decision. That is, the test for "appropriate circumstances" for off-site mitigation may be based on findings that the land containing primary agricultural soils is "of limited value" in contributing to an economic or commercial operation and that devoting the land to agricultural uses is "impractical" based on "its location in relationship to other agricultural and

15

nonagricultural uses." NRB Primary Agricultural Soils Procedure § C(2)(a)(i).

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that the proposed project property does not contain primary agricultural soils as that term is defined in 10 V.S.A. § 6001(15), and therefore that an Act 250 Permit for the proposed project is hereby GRANTED. As the other criteria of Act 250 were analyzed by the District Commission and were not at issue in the appeal, this matter is hereby returned to the District Commission to perform the ministerial task of issuing the permit in accordance with the District Commission decision as modified by this decision.

Done at Berlin, Vermont, this 8th day of December, 2010.

_____
Merideth Wright
Environmental Judge

16